And feel free to begin. May it please the Court. Good morning, Your Honors. My name is Mark Hostetter. I represent the petitioner in this case, George Duggan. I'd like to start with just a few minutes on the context of Mr. Duggan's whistleblowing. Mr. Duggan works for the DCAA, the Defense Contract Audit Agency, which is essentially an accounting firm within the Department of Defense responsible for conducting contract audits for the DOD and occasionally other federal agencies. In 2013, the year of the whistleblowing at issue in this case, DCAA's total dollars audited were $163 billion, and the agency issued over 6,000 reports. However, for five years between August 2009 and July 2013, which included most of the time at issue in this case, the agency's audits were required to contain a conspicuous qualification stating that it did not have a peer review of its quality control system required by GAGUS, generally accepted government accounting standards. The DOD Inspector General revoked its peer review in 2009 of DCAA's quality control system after multiple whistleblowers, including Mr. Duggan, complained to the GAO and the IG that DCAA was not following professional standards in accounting. Sotomayor, I have one sort of ‑‑ it's not exactly a procedural question, but it's a what do we have to decide question. As I understand the case as it now gets to us, there were seven disclosures total, of which it is now undisputed that four of them were protected disclosures, and there's a dispute as to the remaining three. The basic decision that was made was, and I know you don't agree with it, but the basic decision was the protected disclosures had no bearing on the firing because it was for nastiness and insubordination and it didn't make any difference. Do we have to decide whether those remaining three disclosures were protected because there are at least four that are protected? So what difference would it make to decide for sure whether the other three were or were not in that category? Yes, we do have to address that issue because the agency would have no grounds for discipline if, for example, the February emails were properly classified as protected. In fact, they have no ‑‑ I mean, the first far factor is the strength of the agency's evidence. They actually have no evidence of any misconduct other than whistleblowing. All of the alleged misconduct here occurred, was inextricably intertwined with Mr. Duggan's whistleblowing. So let me ‑‑ let me just give you a hypothetical to try to make sure I understand your argument. Let's suppose that in a protected, otherwise protected disclosure, it said, you know, there's ‑‑ you haven't been doing things correctly and it's terrible that you haven't been doing things correctly, but it also went on to say, you're a disgusting human being, I hate your guts, and went on and on and on in the same email or the same letter or the same meeting. Is it your position that no matter how nasty a person is, if the overall communication includes a protected disclosure, that it's sort of kings X, you can't do anything about the nastiness? I mean, suppose somebody, you know, hauls off and slaps somebody during that disclosure. I mean, what ‑‑ what rules should we apply to that? I think it should be reasonably related to the disclosure. If it's going way off on an irrelevant tangent, then arguably that wouldn't be protected. But here, everything is ‑‑ So a given email or a given meeting can be parsed in that way. There's the disclosure and then there may be some extraneous something else going on. If there's something that couldn't possibly be classified as a disclosure, like physical violence, something like that, maybe even extremely profane language, something like that, but if it can reasonably be related to emphatic whistleblowing, which is clearly the case here, then it should all be protected. And that's all we have here for alleged misconduct. In fact, the charges against Mr. Duggan are so strained. First, they say he was too passive in the first morning meeting with the new manager, Cusey. Wasn't emphatic enough in his handshake. Then they say he's too aggressive. I thought it was that he refused to shake her hand. That's what I thought. Absolutely not. No, he shook her hand. They thought it was too reluctant or not ‑‑ At first, he didn't want to shake her hand. Am I wrong? I don't think that's consistent with Mr. Duggan's testimony. He was ‑‑ Well, that may not be his version of it, but isn't there substantial evidence that at first he declined to shake her hand? I don't remember it being that. I don't remember that being the case. Maybe someone alleged it. But we've always maintained we shook her hand, and there was absolutely no misconduct in that morning meeting. And then I think they thought better of a too passive argument and switched to a too aggressive argument. But it's really all emphatic whistleblowing. Well, was it really? I mean, there was at least some evidence that at one of the meetings he just started the meeting by just challenging, I think it was Ms. Kusey, and saying, why are you even here or something along those lines? Why is that protected anything? This is in a team meeting. It was a personal meeting in the morning. But why does that have anything to do with whistleblowing? He was challenging somebody's authority per se. Because her whole reason for being there. So Mr. Duggan's team is actually in the contractor, a big contractor like ECC, Environmental Chemical Corporation, has DCA's sub-office right there on site. And Ms. Kusey's reason for being there that day was to go meet with management about her and her boss, Ron Hopps, ideas to circumvent access to records, rules, and regulations. That was exactly why she was there in the morning. And then in the afternoon team meeting, she announced that that was what she had in fact done. And they started the team meeting with a huge misrepresentation that there hadn't been access to records problems at ECC, which eventually everybody admitted was false. And that's when Mr. Duggan corrected them and championed following the law in the afternoon team meeting. But back to the morning meeting, everyone knew that the point of her visiting ECC that day was to meet with ECC managers to circumvent the access to records rules. That had already come up with the other whistleblower, Wendy Tanaka, Mr. Duggan's colleague, who in December had had a dust-up with Ms. Cusie and her boss, Mr. Hopp, about their plans to circumvent access to records, rules, and regulations at ECC. And they brought in the auditor side, Duggan and, I'm sorry, Tanaka and Downer even kind of brought Duggan in to help them with that fight. I would like to go back to Judge Graber's original point because I'm still struggling with that. If we have someone who doesn't respect their new superior in a position, doesn't think that that person should be there or is competent, doesn't think that things are being done the way an employee thinks it should be done, I can imagine that employee being frustrated, upset, and simultaneously expressing or in the same communications expressing things that might be protected as whistleblowing, but also being incredibly rude and even to the point of insubordination. What, if anything, can an employer do in this context if the employee is both uttering protected whistleblowing communications but also acting really insubordinate? How do — what should the employer do and how should a court or the Merit Systems Protection Board evaluate that and then how should a court deal with it on review? Candidly, I think it has to be a case-by-case basis. But in my view, again — Deference to whom? By the appellate court then giving deference to what? Well, the clear and convincing evidence standard. Do we then give deference to the underlying decision-maker because it's case-by-case? No. I mean, his question is exactly where I am. I don't know exactly how to deal with those situations. So then I went back to, well, how much deference should I give those who are making these decisions on a regular basis? And if I'm to give them quite a bit of deference because it seems to me then it's a matter of determining whether there was clear and convincing evidence and it's a matter of whether — and I listened very carefully to what you said to Judge Graber's first question because it was definitely one that's worried me, and that is what do I do with these communications, I guess? Why isn't it enough to have the four and not the three? And then you said because the three are the only evidence they have. Well, if the three are the only evidence they have, then this decision-maker has determined that they're not appropriate for this. They don't make a difference, so you can go ahead. They're not, if you will, communicative of what we're talking about here, so you can go ahead and look at their evidence. And then they use those in the clear and convincing evidence standard to whether they meet the car factors or not. So, again, here's the guy who's been doing it every time saying it's okay. How much deference do I give them? I was arguing that the only evidence that the agency had were the first six disclosures. I think that encompasses. Well, there's three out of seven. There were seven disclosures. Right. And the three, four were protected, so we're not looking at those anymore. So you said to Judge Graver, but they can look at the three because they're not protected. And you also said that if the three were protected, they'd have no evidence. Right. And so at that point I said to myself, okay, then they use the three to go forward and determine if there was something that he could be fired for. Or they would have taken the decision in any event, but it seems to me they can use that evidence in the three to support they'd have taken the decision in any event. Right? I don't think so. Your position is that all seven are protected, and so it has to be some unrelated behavior for them to be able to rely on what happened during those disclosures. I understood that to be your position. Yes, Your Honor, that is one of my positions. And the Whitmore case addresses a legal question that Your Honor raised, and it said when the AJA ignores or disregards evidence in favor of the whistleblower, then the decision must be vacated. Okay. I see that. You might want to save that for rebuttal. I would like to. Thank you. Good morning. May it please the Court. My name is David Pelkey, and I represent the United States and the Agency Department of Defense in this matter. I'll begin where the panel was with opposing counsel. A protected disclosure under the Whistleblower Act cannot provide protection for insubordinate or inappropriate activity. We've cited cases of that proposition in our brief, and there are other cases in the federal circuit that deal with various fact patterns where individuals raise a protected disclosure, identify some problem in their agency or at work, but that's also tangled together with disparaging or insulting remarks or something else that becomes the basis for disciplinary action. And I don't think it's also proper to sort of take it as a kind of a verified or difficult thing necessarily, because the statute really provides the basis for pulling apart the protected disclosure and whether or not there might be something else that supports a disciplinary action. Because the statute asks, in the absence of the protected disclosure, would the agency have taken the same? So how would you deal with the problem that when one communicates a protected disclosure in a way that is rude even to the point of insubordination, and the employer then says, well, it's based upon the way in which you've been speaking to me that I'm giving you this adverse employment action? How do you deal with them under that framework? And admittedly, Your Honor, it gets a little speculative or almost like a fiction that has to be raised, because if you take out the protected disclosure to look at whether or not there's separate basis for action and the words themselves are expressed in a way that provide the basis for the action, it does become difficult to separate. But the content, the disclosure is really the content of the message. What is being disclosed? Verrilli, The problem I'm having is that it seems that for some of these communications, there was frustration behind the communication, and that may have caused that communication to be expressed in a way that is rude to the point of rising to the level of insubordination. But some of that frustration may very well have been motivated because I've made these And how do we then unpack that and separate out the insubordination part that could justify an adverse employment action versus the protected complaint, the protected disclosure? How do we do that? I think, again, you return to when one removes the information that's being disclosed that's specific. So if we take the morning meeting as an example and the access to records policy, which is identified and has been accepted by all parties, that's the protected disclosure there. When one looks at the specifications and the testimony of the witnesses concerning that morning meeting, there are communications, expressions, body language, characterizations of an aggressive tone that surround that message and I think that are easily and eminently pulled from the content of the message. And I think an individual employee's frustration at what may be viewed as a problem in the agency, it doesn't justify crossing the line into inappropriate or insubordinate behavior. And that becomes a different issue that falls within the discretion of the agency and the supervisors to deal with in accordance with their employment policies. I have, I'm sorry, I didn't, I thought you were finished, finish your answer. I was going to say that's what we see here is we have two separate disciplinary actions. They're well documented and supported and they're not limited to the disclosures. That's, I think, a mischaracterization. There's a lot more evidence of the problematic behavior cited in the specifications and backed up in the record and the testimony of the witnesses. I'm just going to sort of follow on to something that Judge Smith had asked earlier, which is when there's a high standard, as there is here in the statute, clear and convincing evidence, that the same action would have been taken anyway. How do we review a conclusion on the part of the Department of Defense that there was clear and convincing evidence that it met that standard? What is our review of that? It seems odd because it's an unusually high standard to meet, and so is our review more searching? How do we deal with that? I think that this Court's role, and it is confusing because there's these layers of review. I mean, you are sitting reviewing substantial evidence. The decision of the Merit Systems Protection Board, which was reviewing the administrative judge's decision, that clear and convincing evidence supported the decision of the agency. And so when one looks at it in the initial, oh, it's substantial evidence, it's more than a scintilla, it's something like that. But there are cases throughout circuits, I don't know for sure here, I know I've seen it in the Federal Circuit, that when applying a substantial evidence standard of review in a situation like this, of course there is some pass-through to what is the nature of proof that you're looking at, right? And here it is a high clear and convincing evidence standard. So that is going to inform somewhat the review under the substantial evidence. And I think the way it operates in these cases is that, and the MSPB decision here does a good job, I think, of laying out the sort of methodical way often that these cases, that they apply these standards, is first you look at the prima facie case of the whistleblower, whether or not they've met those initial pieces of having a protected disclosure and of it arguably being a contributing factor, sometimes using the knowledge timing test. And then when it turns to the clear and convincing portion of it, the car factors, I think, are what come into play there to aid the court in reviewing and are used by the administrative judge, are used again by the Merit Systems Protection Board, you see in the opinions, to interrogate the record and the evidence that's available to see if that burden is met by the agency. And I think that... So to narrow in what Judge Graber asked you, so if I'm looking at this second question about the clear and convincing evidence and my review is substantial evidence, then I only have to have substantial evidence that the car factors were effectively determined. I don't have to go back and say I would have done it the same way, because clear and convincing almost says I would have done it. Right. And I think the first way you formed it, Judge, is the way that I would advocate is the approach that the substantial evidence review is whether or not in here, did the Merit Systems Protection Board have sufficient evidence in front of it to support the conclusion? So it's not... Well, then, I'll say one more. So then in determining about these three of the seven, since the MSPB was doing it, what is it that I have to find there? Substantial evidence that they did it right? Is that it? Yes, Your Honor. So any evidence that they had that it was right makes it right? Because substantial evidence is that much. I mean, when I'm doing an immigration decision. Correct. It's clearly not the highest standard that's available. And in regards to the three disclosures, I think when this Court brings its substantial evidence review to what the Merit Systems Protection Board did, what you'll see is that the evidence before the Board was what's the nature of the disclosure, what was in it, what was the context of it, and then turn to case law to say, well, this looks like a difference of opinion about something. This doesn't look like a law or regulation or something that's being violated. What is your response to my question concerning whether we have to decide about those three additional disclosures? What difference would it make if they were protected? My response is the opposite of the opposing counsel's response. It doesn't matter. So from your perspective, we could assume that they were protected and move on, because the real question is whether there's clear and convincing evidence and so on and so forth. Right. And if that's your answer, that's where I thought he was going to be and he wasn't. So then if they're protected, these three are protected, then it's my understanding they can't use anything in those three to meet their burden on clear and convincing evidence. It would have taken the personnel decision in any event. But if they three are not protected, then they can use that evidence in meeting this clear and convincing standard? No. I would return to the original point that the protected disclosure can't be used to shield anything. So the fact that an element of it can't be used to shield anything. So if they're protected and he was rude, they can deal with rude. Well, so in the case of the e-mail, right, that opposing counsel said if that's included, now they have nothing. It's not true because the first two specifications have more than just the protected disclosures in them. Even the third, which is clearly not a protected disclosure because it's about candor versus respect in the workplace. It's not a violation of a law or a rule of any kind. But even if one were to assume it were a protected disclosure, when one looks at the e-mail itself, beyond the observation about the charge that candor and respect are being muddled and if one accepted that as a violation of rule or law, the e-mail is filled with invective, insulting tone that comes through and that people commented on in their testimony and that's in the record. So that element comes out. That's not a protected disclosure. That's extra to the protected disclosure, and that can form the basis for a disciplinary action. So whether it's four disclosures or seven, we would submit that the Merit System Protection Board was correct. Are there any cases that you'd guide us to, including even from the Federal Circuit, that would say that when a protected disclosure is made, but it's made in a rude, insulting, and even insubordinate fashion, the way in which it's communicated can by itself be sufficient to support an adverse employment action? I can point to some cases that deal with scenarios like that. There's a case, and I'll present some on both sides, too, that you can see where a court also found that the tone, you know, they couldn't get it out from the. So an example of that is Greenspan v. Department of Veteran Affairs. That's at 464 F. 3rd, 1297. These are all Federal Circuit cases. Are these cited in the briefs? This is not. I thought that this might become an issue. Excuse me. After argument, would you get a slip from the deputy clerk to do essentially a 28-J letter and give a copy to opposing counsel and make copies for us? Of course, Your Honor. So Greenspan concerned a doctor who raised some complaints in a staff meeting. The charge was that the complaints that were made were in a derogatory fashion. I think it may have actually had to do with nepotism, which was something that was in the earlier case today. And the way the court analyzed the protected disclosure there, when it found the protected disclosure, said, well, here the agency hasn't proven that it was derogatory in any way. And the agency also said it was disruptive, but they only raised that on appeal. So there hadn't been the sort of contemporaneous evidence that there was something in the way it was made that was problematic. Now, after Greenspan, there's a case called Khalil v. Department of Agriculture, which is 479F3-821. And there's a very brief mention, but in that case specifically, because Greenspan had been decided, the employee said, well, that means that you cannot, that the tone of a protected disclosure cannot be used to back up any kind of disciplinary action. And the Federal Circuit explicitly said that Greenspan does not mean, quote, that the character or nature of a disclosure can never supply support for any disciplinary action, that that's not what they mean, and that that can't be what they mean, because there has to be separation. And a case that may be also of interest is Pedellios, that's P-E-D-E-L-E-O-S-E v. Department of Defense. That's an unreported case, 479 Federal Appendix 341. And there, there are e-mails and communications that present, made to a supervisor, that present both protected disclosures and also have issues of tone and insult and things that were taken as a basis for disciplinary action. I see that my time is almost up, so if there's no more questions. I don't believe there are. Thank you. Thank you, Your Honors. Mr. Hostetter, you have a bit of rebuttal time. Yes. Thank you, Your Honors. As I was sitting there listening, it occurred to me that I need to stress Mr. Duggan is an auditor. This is a profession where we don't need or even want friendliness, particularly. There are qualities that are the pillars of auditing, such as independence, skepticism, candor, and honesty, which have all been in short supply at DCAA, except for people like Mr. Duggan. I also, I started the argument talking about DCAA's history. Where's the dividing line between an appropriate degree of unfriendliness in your auditor and insubordination? Well, in the Whitmore case, there was profanity. There was pretty extreme profanity, threats of violence, things infinitely more extreme than that. I think the most they have on Mr. Duggan is the word arrogant, which he applied not even to a person directly, but to a response in an e-mail chain. If we look, we have, I mean, we can think of Mr. Duggan's responses as, sir, they were frustrated. And there are so many layers of provocation, going back the decades of waste, fraud, and abuse at DCAA, up to the particular e-mail chain, where each one, it wasn't Mr. Duggan e-mailing out of nowhere for no reason. It was always a response to an attack on him. So these were provoked. And the AHA ignored and discounted the context, the DCAA's miserable history of problems that Mr. Duggan is trying to fix, all the way up to the immediate provocations. And also, critically, on CAR Factor II, which we haven't even discussed, very briefly, motive to retaliate. I mean, people's careers, maybe even liberty, were on the line here. So there was enormous motive to retaliate, specifically the individual managers at issue going up to HOP, all the way up to the top of the agency, and ample evidence of institutional animus, which the Whitmore case described. We see agency head Fitzgerald talking with all the various senior managers about Mr. Duggan being unprofessional, bitter, short-sighted. There was massive institutional and personal animus against Mr. Duggan on CAR II. And on CAR III, they had no evidence either. CAR I, there was no agency evidence other than whistleblowing. CAR II, it was all Duggan's evidence of huge retaliatory motive. And CAR III, they had no relevant comparador. Thank you, counsel. You've exceeded your time, and I think we understand your position. The case just argued is submitted. We are very appreciative of helpful arguments from both counsel, and we are adjourned. Thank you.
judges: Graber, N.R. Smith, Simon